We'll now hear argument in Case 10-179, Stern v. Marshall. Mr. Richland. Mr. Chief Justice, and may it please the Court. Pierce Marshall filed a claim in Vicki Marshall's bankruptcy case. He alleged he was damaged because she falsely accused him of cheating her out of money that her late husband intended to give her. In order to preserve its claim against him, the bankruptcy estate had no choice but then to file its counterclaim in the bankruptcy court, alleging that those statements were in fact true, and that far from Pierce being entitled to money from the estate, he owed money to the bankruptcy estate. This Court's case has established that the bankruptcy court was constitutionally unauthorized to decide that entire dispute. Congress drafted the bankruptcy statutes. Excuse me, Your Honor, I'm sorry. Sotomayor What's the authority at all for a bankruptcy court to adjudicate proof of claims without violating Article III? I don't think we've ever had a case that's actually said that. This Court has never approached that issue directly. Of course, excuse me. So what's the constitutional basis? Well, of course, it did not reach that issue in this case, because the court below and the Respondents assumed for the purposes of this case that in fact there was authority for the bankruptcy. I'm not sure how that helps. If there is no jurisdiction for the bankruptcy court to adjudicate proof of claims, then how can it adjudicate counterclaims? Don't both fall if there's an Article III violation? Well, I don't think so, Your Honor, because Article III, of course, is not jurisdictional in the sense that we think of basic fundamental jurisdiction, subject matter jurisdiction. It can be waived, of course. But beyond that, I think that Marathon, as I said, assumes that there is an Article III authority to adjudicate the proof of claims. So answer the question, don't assume. Okay. And well, the answer is that under the various theories that this Court has put forth, there is a basis for the bankruptcy court to adjudicate a proof of claim. One theory, of course, is the public rights theory. And in Gran Financiera, this Court established that the public rights theory was broader than just the kind of situation where the government was a party, and it said that it the public rights are defined as whether Congress, acting under Article I, has created a seemingly private right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary. The claim here was not one that was created by Congress, though, was it? That's correct. But this Court has never held that, in fact, the claim had to be created by — literally created by Congress. What this Court has always talked about is, is the claim one that Congress has established as being applicable within the system, but that may be based on a State law claim? For example, when, you know, this Court analyzed the claims which were at issue in Gran Financiera, they were fundamentally common law claims. It didn't depend on the fact that they were Federal claims. The same thing was — is true in the way that the — that this Court analyzed the claim in Marathon itself. It made the determination that because this was — I think the way Justice Rehnquist stated it was, this is the stuff that would have been adjudicated at common law in Westminster in 1789. So it was not the Federal or State nature of the claim. It was the fact that these were common law claims that made it important. Kagan Are there any limits, Mr. Richland? Suppose that Congress had authorized bankruptcy courts to decide contract disputes between two creditors in a bankruptcy proceeding. Would that be all right?  I think that a — that sort of thing would be related to, perhaps, within the related to jurisdiction of bankruptcy, and that would fall within the problems identified in Gran Financiera, for example. That would be beyond the scope of what could be adjudicated in bankruptcy. But what we are talking about here is claims and counterclaims that are at the essence of what bankruptcy courts do. The bankruptcy system, of course, is set up in order to adjudicate claims to a limited amount of money. And in order to do that in an efficient manner, in a manner that will not utilize the entire amount of the — of the estate in the adjudication process, it's set up the bankruptcy courts. And so they are set up in order to be efficient, effective. And as soon as, of course, as we get an Article III court involved, that really does place some brakes on the efficiency. It becomes much more costly. Sotomayor Can the bankruptcy court adjudicate permissive counterclaims? And if you posit a no, what's the limiting principle? Well, certainly the statute, 157B.3.2, does not distinguish between compulsory and permissive counterclaims. And it's also true that this Court's authority in Grand Financiera, in Langenkamp and in Katchen, the rationale of those cases is broad enough to encompass permissive counterclaims. But this Court need not reach that issue in this case, because here we do have what both the court of appeals below and what seems to have been conceded by Respondents is indeed a compulsory counterclaim. Ginsburg Mr. Richland, isn't there this difference? Just take ordinary civil procedure. Compulsory counterclaim doesn't have to satisfy any jurisdictional requirements because it comes in under the wing of the main claim. But a permissive counterclaim has to independently satisfy jurisdictional requirements. So that could be a reason, even though the bankruptcy code just says counterclaim, to distinguish the two. If there's authority to deal with the claim, then there's authority to deal with the counterclaim. But if it's a permissive counterclaim, it's not based on the same transaction or occurrence, then it would have to be a self-standing claim. But as you have said, this case does present what the parties have agreed is a compulsory counterclaim. Well, I think that is an excellent justification for why one might want to make this a very narrow determination in this case. In fact, Justice Rehnquist, in his concurring opinion in Marathon, said that this is an area which is very touchy and difficult and complex, and it is one where we particularly should not, as a court, go beyond the facts of the individual case and what must be decided for this case. Of course, the other thing about compulsory counterclaims and what makes it more applicable in this kind of situation in an Article III setting is that, according to the Schor analysis, what we are talking about is how much of an intrusion on the Article III process are we talking about. And if we assume, as appears to have been assumed here, that the claim itself may be determined by the bankruptcy court, then the net intrusion by determining a counterclaim, a compulsory counterclaim, is much, much smaller, because there almost inevitably will be overlap between what must be decided by the bankruptcy court on the claim and what must be decided on the counterclaim. Kennedy, this began as a motion for non-dischargeability. Is there any cases in the Federal courts which tell us that a motion for non-dischargeability does or does not require the pleading of a counterclaim? I don't believe so, Justice Kennedy, but in fact what happened here was something much, much more than just a motion, a request for a determination of non-dischargeability, because one month after that was filed, the actual proof of claim itself was filed. And all the courts below have uniformly concluded that when that additional step is taken, it could have no purpose other than to present the claim, beyond just the question of dischargeability, present the question of liquidation of the claim to the bankruptcy court. And the counterclaim came at what point? After the proof of claim was filed? That is correct. Some weeks after the proof of claim was filed, the counterclaim was filed. The objections and counterclaim was filed. The statutory structure here is something that it has been suggested that this is a question of statutory interpretation, and that in fact the statute does not provide for this kind of treatment. That in fact there is a two-step process by which one determines whether a bankruptcy court can finally decide a counterclaim. But I think that really is belied by the plain language of the statute as well as the statutory structure. Of course, the starting point is 157b2c, which very clearly and straightforwardly states that core claims include counterclaims by the estate against persons filing claims against the estate. Alitoso, what do you make of the fact that B2 says core proceedings include, but are not limited to, the matters that are listed after that? How would a court go about deciding whether something that is not specifically mentioned constitutes a core proceeding, except by looking back to B1, which is what the court of appeals did? Well, I think that a court would indeed, if one were looking at something that was outside the scope of the explicitly mentioned categories from B to N in 157b2, one would in fact look beyond the words of A and O, those are the two catch-all provisions, and one would look to the usual, normal principles of statutory construction to determine what fit within them. But 152 157b2c is very straightforward, does not require any additional interpretation. There is a counterclaim against a person filing a proof of claim is just on its face something that is unambiguous, and the fact that there are more ambiguous categories there would probably require a court to go beyond, you know, the four corners of the statute and look to the normal kinds of principles we use in determining what statutes mean. We would look at the categories that were actually included. We would see is this something that is similar, does it fall within that category, and so on. Alitoso What do you think is the principle that defines a core proceeding? Some of these specifically enumerated items are very, potentially very broad. A, matters concerning the administration of the estate. Verrilli, That's right. The A and O are very broad. And so what that category, what those two categories would have to be informed by and are informed by are the principles of statutory construction that are normally used and included among those we would contend would be looking at the words of the statute that talk about this arise under the Bankruptcy Code or arise in a bankruptcy case. So for those particular categories, the lower courts have been comfortable with the idea that we look at the language of the statute, apply those words and use those as limitations. But with respect to the specific categories, from B to N, the courts have uniformly indicated that those categories do not require further interpretation, that they are straightforward and they constitute core proceedings on their face. I think the — with respect to the question that you asked, Justice Sotomayor, and the whole issue of whether a matter is under — may pass muster under Article III is a very easy one in this case. And the reason for that is that if we look to Schor and Schor's Article III analysis, we can see that it really divides into two parts. Part one is, was there some — is the Article III, to the extent the Article III right, is a personal one. That is, to the extent that it guarantees someone a decision-maker who is not going to be affected by the political branches of the government or by the winds of politics, that's something that's waivable. And in fact you waive it when, in order to protect yourself for a debt that is owed to you, you make a claim in a bankruptcy proceeding. We do have a doctrine that you cannot — you cannot condition a Federal right upon the waiver of constitutional protections. And that seems to me what you're saying here. If you want to get paid by the bankrupt estate, you have to waive your right to a jury trial. Well, Justice Scalia, that is precisely what this Court addressed in footnote 14 in Grand Financiera. And it explained that, yes, waiver under many circumstances, and under the Schor case, for example, waiver involves a choice between two equal or optional options. However, I should point out, in this case, there was another option. There was a dischargeability complaint filed. And in fact, the choice was made not to pursue that, but instead to pursue the proof of claim. There was already a State court suit on file, and instead of requesting a stay, a relief from the bankruptcy stay, the proof of claim was filed. In general, however, the Alexander v. Hillman principle, which is also discussed in footnote 14, is what applies in this — in this circuit. Scalia Would it have been normal for the bankruptcy judge to lift the stay with respect to a claim that could be presented in the bankruptcy proceeding? Well, certainly the principles of permissive abstention, for example, encourage if, in fact, comity is to be respected and if there is another suit pending elsewhere. The bankruptcy courts will permit the suit to proceed in that jurisdiction. So that does, in fact, occur. But it was never even tried here, and that's really the point. And I'd like to reserve the rest of my time, but I would like to make the one final point before I sit down initially, and that is, if this Court should decide to reverse, that as we requested in our — in our reply brief and as we requested in our relief and our cross-appeal, we would request that this case be sent back to the district court, because it was the district court that in the first instance applied the improper standard, and we think that that would be an appropriate way of taking care of this case in this instance. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court, I'd like to begin by addressing Justice Scalia's question about the — what's sometimes referred to as the unconstitutional conditions doctrine, whether it's appropriate to place a person in a position where he has to make a choice whether to assert one of two constitutional rights. And although there is in many contexts reluctance to put an individual to that choice, there's not an inflexible rule against it. And to take one example, a criminal defendant has an absolute constitutional right to testify in his own defense. He also has an absolute constitutional right to resist compelled testimony in which the prosecution will ask him hostile questions. But he doesn't have a constitutional right to do both. If he chooses to take the stand and testify, he may be cross-examined at trial by the prosecution, and he has no residual Fifth Amendment right to resist the hostile question. Roberts. It's a little different when you're talking about the right to have a decision before an Article III tribunal. Well, I think it's a bit more fundamental than the examples you're giving. Well, I don't know that it's more fundamental than the right not to be questioned against one's will in a criminal proceeding in which you're. Well, not fundamental in the sense of, you know, is it important or not. I guess fundamental is not the right word. Maybe structural or something like that. It's sort of the whole basis for the decision that's going to be made. I guess there are two potential objections to the use of a non-Article III judge, and one of them would be, as you say, structural. That is, one of the objections that is sometimes made to the use of non-Article III adjudicators is that if Congress can parcel out part of the work of the judiciary to other units, the stature of the judicial branch will be diminished. I think this particular statute doesn't create that risk because the use of bankruptcy judges is entirely under the control of the district judges. That is, the district court decides whether to refer a bankruptcy case to the bankruptcy judge, the district court can withdraw the referral with respect to particular proceedings. Roberts' Well, that just means that the district courts acting in concert with Congress take action that undermines the long-term institutional and constitutional basis of the judiciary. And the district courts have very different reasons and incentives to do that. That doesn't mean that all bets are off, and just because they're involved in the process, it's not a concern. Well, to the extent that the concern is with fairness to individual litigants, that is, the idea that the Respondent in this case has a right to an Article III tribunal and should not likely be held to have waived it, I think that a person who seeks affirmative relief from a court doesn't waive all his constitutional rights, to be sure, but should ordinarily be taken to accept the consequences that ordinarily follow from a request for judicial relief. And as a matter of history and tradition, one of the consequences that follows from the assertion of an affirmative claim is subjection to counterclaims, and especially compulsory counterclaims. Scalia, that can't be right. I mean, you can take all sorts of matters that belong in Article III courts, and so long as you place them in some other tribunal where somebody is coerced into coming in, supposedly voluntarily, it's all okay. I mean, that's not an adequate protection. Well, the Court has applied this basic principle in a number of contexts. That is, in McElrath v. United States, which is cited in the Petitioner's brief, the plaintiff filed suit against the United States in the court of claims, and the United States then asserted counterclaims against him, and the original plaintiff said that he had a right to jury trial under the Seventh Amendment. Well, that's because there's a basic sovereign immunity.  The government doesn't have to be sued at all. So it can make conditions, but that's not this case. Well, the government can make conditions, but the point was the plaintiff in that situation had no alternative forum to which he could attempt to obtain a recovery from the government. But that's because of a limitation of sovereign immunity, and you don't have that analog here. Another example would be Adam v. Sanger, which is also cited in the Petitioner's brief, in which I believe it was a Texas plaintiff filed suit in the California State courts, and the California defendant asserted a cross complaint, basically a counterclaim against him, and the Texas plaintiff objected to the California court's assertion of personal jurisdiction. And this Court said, by seeking affirmative relief from the California court, you have subjected yourself to the jurisdiction of that court for all purposes for which justice requires. And it said the State can make that the price it pays for seeking affirmative judicial relief in its courts. Now, it may have been the State can do that, but can the Federal government make it the price that you pay for going into a non-Article III tribunal? It's a different situation. Well, let me step back a second and address the questions that were posed by Justices Sotomayor and Alito at the beginning about the initial authority of the bankruptcy judge to adjudicate the claim brought against the State, because I agree with my colleague's question and with Justice Sotomayor that this is a question that this Court hasn't squarely resolved. Now, it's true that the initial State law claim, the defamation claim that was made the basis for the claim against the Estate was a State law cause of action. But as this Court said in Katchen v. Landy, the effect of the commencement of the bankruptcy case is to convert the claimant's potential legal claim against the defendant into an equitable claim against the Estate. And Respondent's equitable claim against the Estate, seeking a share of the assets, was a claim created by Federal law. That is, it's true that in the course of deciding whether Respondent was ultimately entitled to a share of the Estate, the bankruptcy court would have been required to adjudicate State law questions and conduct something like the same proceedings that could have arisen in a State case. But actually obtaining a share of the bankruptcy Estate requires more than that there be a valid debt. The whole point of bankruptcy is to deal with situations in which the debtor doesn't have enough assets to go around, and so the bankruptcy court will have to not only determine whether a valid debt exists, but what are the relative priorities of various creditors, what is the appropriate pro-rate of share for a particular claimant, and all of that has to be resolved under Federal law. So when Respondent filed a proof of claim in the bankruptcy case, it was asserting a Federal right cognizable under the bankruptcy code. And again, none of the analogs that I've identified are precisely analogous to this one, but I think it's noteworthy that Respondent cites no contrary authority from this Court. That is, Respondent cites no case in which a claimant has invoked the authority of a particular court and has asked for affirmative relief, and this Court has held that it nevertheless had a constitutional entitlement to be free of counterclaims. And that seems particularly true of compulsory counterclaims, both because they are counterclaims that our legal system affirmatively encourages to be brought within the same proceeding, and for the reason that Justice Ginsburg said, that in an analogous area of the law, when we ask whether there is Federal court jurisdiction over a counterclaim to begin with, if the counterclaim is compulsory, there need be no independent basis for jurisdiction. I'd like to address quickly the statutory question, and the relevant provisions begin at page 1A of the government's brief. Ginsburg. Would you include in that this 157b-5, because this whole thing would be a futile exercise if the tort claim comes out of the bankruptcy judges? I think the 157b-5 is, in our view, not jurisdictional. It deals with the respective authorities of the bankruptcy judge and the district court within the bankruptcy case, but it doesn't go to the question of what the Federal courts can adjudicate, and the limitations on bankruptcy court authority are waivable and subject to consent. The court of appeals did not address the personal injury aspect of the case. There is a lively dispute between the parties as to whether that objection to bankruptcy court adjudication was properly preserved, and that would be open to the court of appeals on remand if this Court were to reverse. On page 1A. Kagan. Mr. Stewart, do you think that we should resolve the constitutional question if there is some significant possibility that it wouldn't be necessary because the claims would be found to fit into b-5? I think, yes, I mean, this could have been a prudential factor that might have persuaded the court not to grant certiorari in the first instance, but the court has obviously identified this as an issue that warrants the expenditure of its resources, and we think that there is no jurisdictional impediment to a decision in this case. Does the government have a position on what the answer would be, at least remanded it, because that's an open question, but does the government have a position on whether these kinds of claims would have to be heard by an article 3 judge? Again, we don't have a position with respect to the defamation claim. That is, defamation claims may be personal injury claims in many contexts, but in this case it was a personal death which seems to cut the other way. The actual counterclaim was not a defamation claim, it was a tortious interference claim, and we don't think that would be a personal injury claim. With respect to b-1, it says bankruptcy — I see my time is up. Thank you. Thank you, counsel. Mr. Englert. Mr. Chief Justice, and may it please the Court. There are three possible grounds for affirmance of the Ninth Circuit in this case, one constitutional and two statutory. And the 157b-5 ground, which was preserved below, received some discussion at the very end of Mr. Stewart's argument. But I would like to start the meat of my argument just the way Mr. Stewart started his argument, which is by addressing Justice Scalia's question. And like Mr. Richland, I would like to talk about footnote 14 of the Granfinanciera opinion. Now, Granfinanciera had to distinguish Schor, which is the only case in which this Court has ever said a State law claim could be a public right so that it could be adjudicated by a non-Article III forum and not subject to the Seventh Amendment. And Schor rested on a consent and waiver rationale and on a structural rationale that an alternative Article III forum was made available by Congress for everyone in Mr. Schor's position. In distinguishing Schor, this Court said in footnote 14, parallel reasoning is unavailable in the context of bankruptcy proceedings because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims. So with respect, this Court has already answered the question Justice Scalia posed by saying a debt creditor may not be put to that choice. Now, if you think that's the case, I would like to ask Justice Scalia's question. I have it unpackaged, and I want you to unpackage it with me. You're obviously not deprived of a State or Federal trial forum to decide your claim. What you're deprived of, you can get your judgment. No one's telling you you can't go to the ghost courts and get a declaration of your rights. What you're being told is you can't get paid on it. But that happens all of the time, either by the vagrancies of the fact that a debtor goes bankrupt and doesn't file in the bankruptcy court, or does file and there's been a discharge. What you haven't said to me is what entitles you outside of equity, and what stops either a State court or a Federal, a State legislature or a congressional legislature from saying when someone is in bankruptcy, this is the rest, and these are the people who are entitled to it. It's a separate claim. It's not the State law claim. It may be measured by State law entitlement, but it's a separate claim. Why isn't it just a separate claim? Roberts. Justice Sotomayor, in attempting to answer your question, I'd like to distinguish sharply between a claim of the creditor against the race. But that's what you have to become to make that claim, meaning you would need to adjudicate your State law entitlement. You get a judgment saying she defamed you. Then what do you do with that judgment? That judgment then is covered by the priority scheme of Federal bankruptcy laws, which are passed pursuant to congressional authority, constitutional authority in Article I, Section 8, Clause 4, which is why, in answer to the question Your Honor asked first of Mr. Richland, although the Court has never squarely addressed it, it's broadly accepted that there is no problem with adjudicating what would otherwise be State law claims by the creditor against the debtor in bankruptcy. It's an entirely different subject when the debtor tries to bring a claim against the creditor. That's what Marathon addressed. That's what Grand Financiera addressed. That's what Katchen v. Landy addressed. Now, in Katchen v. Landy, the Court said the case turned on, or largely turned on, the proposition that Congress had prescribed that the counterclaim, the preference avoidance counterclaim created by Act of Congress, must be adjudicated before the main claim against the race and against the debtor could or couldn't be disallowed. And the Court returned to that theme in footnote 14 of Grand Financiera, saying, as Katchen makes clear, however, by submitting a claim against the bankruptcy estate, creditors subject themselves to the Court's equitable power to disallow those claims. So to the extent that the State could do that, why can't it do what it did here? Which is to say, if you want to make an equitable claim against the estate, it's not going to be in the amount of your judgment because they're in bankruptcy because they can't pay your judgment. If you want a piece of this, you have to consent to all claims, all compulsory claims, let's not try to get into the compulsory permissive category, to be adjudicated. Otherwise, like with preferences, there's an unfairness that makes this unequitable. You're asking the estate to give you something, but you're not willing to submit an equity to deciding whether there's something you should give the estate back. Compulsorily. I mean, you know, not what — I'm trying to take the permissive issue out. Sure. And the answer I really do submit is footnote 14 of Ground Financiera, pointing out that there's nowhere else to go for a creditor in bankruptcy, which distinguishes bankruptcy from Shore in particular, but from all the other settings in which the Court has said that by submitting a claim, you subject yourself to the jurisdiction for all purposes.  Sotomayor. The security rules means the people with secured interests get paid before unsecured people get paid, and there are insider rules. Equity, as in terms of how the bankruptcy sets up the rest, is at the vagrancies of the legislature. Exactly. They choose what they're going to permit you to take under what circumstances. So why is it inequitable? To force you — now, to force you, we'll use that word, to say if you want money from the risk, what you trade off is letting the debtor sue you for what you owe. Well, I don't know if it's inequitable, but it's certainly unconstitutional. And the reason it's unconstitutional is because it's the same thing. You don't have a constitutional right to collect your debt. You have a constitutional right to have your claim adjudicated by a court. With respect to the court. You can go to a State — well, once you get the stay lifted at the end of the discharge, you can sue the Estate. You may not get a judgment that you can collect after that. With respect to the claim of the creditor against the debtor and against the race, I have no problem with that analysis. When the debtor, instead of saying the race is limited and it can only be distributed so far, instead says, I get to bring my counterclaim against the creditor in a non-Article III forum, and the non-Article III forum gets to hear it and determine it, not just hear, as 157c1 says for certain types of claims, then I suggest there is a constitutional problem, at least with respect to claims that neither, as in Katchen v. Landy, require rejection of the main claim, nor, as in Katchen v. Landy, are governed by Federal statute. This is a State common law action for a tort, which has importance for 157b5, which has importance for 157b2, and which has extremely high importance for the constitutional question. In Marathon, as everyone here knows, there was no majority opinion, but one point very much in common between the plurality and the concurrence of Justice — then-Justice Rehnquist was that it mattered a great deal that it was a common law claim under State law. Here, we have a common law claim. Sotomayor, without a proof of claim. Yes. There was no proof of claim in Marathon, so this case presents a different issue than Marathon does, but it does present, categorically, the same kinds of issues presented in Katchen, Langenkamp, and Schor. The only one of those cases that allowed a State common law claim to go forward, a State common law counterclaim to go forward, was Schor. And the Court, as Mr. Richland correctly said, divided its opinion into a part dealing with the personal rights conferred by Article III, Section 1, and the structural rights protected by Article III, Section 1. In the part about personal rights, the Court held Mr. Schor had waived his personal right to an Article III forum. In the part about structural rights at page 855 of that opinion, the Court said that it mattered to the constitutional analysis that Congress had made an Article III forum available for pursuit of that claim. So it is terribly, terribly important whether an Article III forum is available when one is forced into a non-Article III forum, as Pierce Marshall was, if he wanted to have any opportunity to collect from the race, saying that he thereby in some meaningful way consents, and saying that the structural purposes of Article III are not implicated, is not in line with this Court's cases. Ginsburg. Something you just said about if he had any opportunity. I thought his position was. This is a non-dischargeable debt. Even if it's a discharge in bankruptcy, this debt would survive. That's correct. So it wouldn't be wiped out. I mean, he would have another forum. He would have another forum against her post-bankruptcy assets after she had her pre-bankruptcy assets distributed. So it's a different kind of opportunity to recover from a different set of assets. If he wanted to have any shot at any of her pre-bankruptcy assets, he did have to file a proof of claim and not just a non-dischargeability complaint. Now, let me clear up one very minor aspect of the record while I'm talking about the proof of claim and the non-dischargeability complaint. I doubt this ends up mattering to the Court's decision, but Mr. Richland misspoke slightly when he said the counterclaim came weeks after the proof of claim. The proof of claim was June 12th. The counterclaim was June 14th. And in its very first paragraph, it says it is a counterclaim to the non-dischargeability complaint. It doesn't purport to be a counterclaim to the proof of claim. I doubt this ends up mattering, but it might be important for this single purpose. It is inconceivable that this was a compulsory counterclaim to the non-dischargeability complaint. It might have been a compulsory counterclaim to the proof of claim, but not to the non-dischargeability complaint. Now, I've explained why I've been here. Ginsburg-Miller Just one more point about the non-dischargeability. He didn't have to bring that claim, did he? I mean, if it's a non-dischargeable debt, it doesn't have to have the bankruptcy judge confirm that it's a non-dischargeability debt. Goldstein, I haven't studied closely the interaction between the automatic stay of section 362 and the non-dischargeability complaint of section 523, so I'm not 100 percent sure my answer to Your Honor is correct. But I believe that's not correct. I believe that in order to preserve the argument that something is non-dischargeable, one does have to go to the bankruptcy court under section 523 and seek a determination of non-dischargeability. Now, the two statutory arguments are before the Court, and I'd like to say something briefly about each of those two statutory arguments. With regard to 157b2, you have heard Mr. Richland say this afternoon that the lower You have heard Mr. Richland say, 157b2c, subparagraph c, doesn't need to be so limited because it's so straightforward. But the point is not how straightforward it is. The point is how broad and constitutionally dubious it is. And if the canon of constitutional avoidance means anything in limiting the scope of 157b2, it should have just as much application to c as it does to a and o. And the — it is not as analytically neat as some other cases of statutory interpretation. But the most obvious way, if one is going to limit the reach of c as well as a and o to do so, is to take the words arising in and arising under, just as Mr. Richland concedes they are used in limiting a and o. The alternative is to keep those words as surplusage, and the alternative is to run headlong into the constitutional issues.  Breyer. Can you go back to that for one second? I understand the due process issue, which is Brandeis' issue in Crowell. I think I can — you are not going to say anything that I can't read in the brief on that. But the other one is worrying me, the structural issue. So imagine there is no due process concern whatsoever. Now, when I looked at Crowell, your case would seem to fall right in it. It is an adjudication under the law as such. Between two people, whatever that famous line is, you are captured by that one. So the question is, can you get out of it with later cases? And you point to Schor to get out of it. And Schor, as I read it, is an all-factors case. When she talks in the structural part of — about when Justice O'Connor is talking about the non-due process part, the structural part, just what you said, that there is a hard and fast rule which means you win. Now, who's — should I just read this case further and make up my mind about that, or is there something you want to say about it? Well, no, Justice Breyer, I think I can agree with most or all of your premises and still argue that we should win under the proper constitutional analysis. The point is not that the opinion of the Court in Schor said in so many words that the availability of an alternative to Article III forum is dispositive. The point is it has to be dispositive, given the larger sweep of this Court's cases, because otherwise it is simply an all-factors test governing a structural provision of the Constitution. Well, yes, that's what she says. And what you are interested in there, the key thing is not fairness. The key thing is maintaining the integrity of the judicial system. And Crowell, Justice Hughes, says you've made that integrity as long as there were a review of matters of fact, the independent decision by a court of questions of law, and reservation to the court of constitutional facts which have never been heard of since. Okay? So we have this case, and your issue is, after all, something that for many, many decades or longer has been the subject of a bankruptcy proceeding. The bankruptcy judge is an adjunct to the court. It is well established, this kind of review. Every part of Crowell is met. So what is essential to the integrity of the judicial process that requires you to have a de novo hearing before a district court rather than the kind of review that's given here? Well, those, with respect, Your Honor, I believe are the arguments that were rejected in Marathon. In which case? In Marathon, in Northern Pipeline v. Marathon. Well, Marathon, you know, you had 4-4 and who knows what it stands for, and then we have a sentence of what it stands for. And if you read that one sentence, I don't think you can say it's slam dunk for you. Well, I'm not saying Marathon makes this case a slam dunk for me, Justice Breyer. I am saying Marathon rejects many, if not all, of the premises of your question starting with the parole pension. Of Marathon, you're saying that 4-4 judges really reject a decision like Crowell, which is a kind of foundation stone? No, I'm suggesting that they reject one particular interpretation of Crowell, a very broad interpretation of Crowell. Of course, Crowell involved public rights in the narrow sense, didn't it? It was a public suit. Correct. True. And but it's also a justice. Sometimes there should be different standards, even if you do not agree with my separate opinion in Grant Financiera that that should be the only category. There may well be different standards for public suits in the narrow sense that were involved in Crowell, and public suits which are governed by some totality of the circumstances test, which isn't supposed to be. I agree with that. Excuse me, Justice Scalia. I do agree with that, and I think one doesn't have to adopt the reasoning of the concurrence in the judgment in Grant Financiera to come to that conclusion. I think part 4 of Grant Financiera itself supports that proposition. But I also think, returning to Justice Breyer's question, I do think Marathon does stand for certain propositions that this Court has accepted in later cases and that do suggest that Crowell is not to be read broadly and that some of the limitations on Crowell are the ones suggested in Justice Scalia's questions. The thing that the concurrence, the two-justice concurrence in Marathon agreed with the plurality on was that what was fundamental to the disposition of that case was that the claim by the debtor against the creditor was the stuff of common law at Westminster in 1789. It was a State law claim, not by the creditor against the debtor, but by the debtor against the creditor. Ginsburg. Because there was no bankruptcy court handle to start with. There was no claim. And if you're going to go back to equity, equity lays hold of a claim that fits within the equity court, and then, you know, there were clean-up and clear-up doctrines so they could decide the whole case. So I think the one thing one can say about Marathon is that when the debtor has a claim against the creditor, and the creditor hasn't made any claim in the bankruptcy, you can't drag that into the bankruptcy court. But once the bankruptcy court has authority over the claim, the creditor's claim against the debtor, then the court can clear up the whole matter. If all we were talking about, Justice Ginsburg, were doctrines of equity, then perhaps Alexander v. Hillman would be the governing precedent, a non-constitutional case later cited in a Seventh Amendment case and now attempted to be imported into an Article III case. But I do respectfully suggest that the Constitution places tighter limits on the authority of non-Article III tribunals to adjudicate counterclaims than just the general and very permissive rules that allowed equity courts to adjudicate counterclaims without the — Alexander v. Hillman was a case about old Equity Rule 30 and whether it superseded Section 51 of the Judicial Code and its venue provisions and personal jurisdiction provisions. If all we were talking about were equity, that would be a fine analysis. But I do read the collection of this Court's cases, including the crucial decisions in Katchen and Langenkamp, which involved Federal counterclaims that by statute defeated the main claim, and Schor, which I do believe relied heavily on the consent theory and on the availability of an Article III forum, I do read that collection of cases to suggest that there are tighter limits on assigning State law claims and State law counterclaims to non-Article III tribunals. Sotomayor, you're basically saying that Congress cannot delegate any State law-based claim to which a jury is entitled to the bankruptcy court counterclaim at all. So if you have a claim by lawyers for their fees in a defense of malpractice, maybe they can adjudicate that, but they can't adjudicate the malpractice claim. It would be a counterclaim. I am saying that, Your Honor, but let me say for a moment why that's not inefficient, why that's not such a surprising proposition. Remember, the bankruptcy court can hear all of these claims unless they're covered by 157b-5. It just can't determine them. So the only thing we're talking about is the standard of review. And with respect, it's not a surprising proposition that the requirement of an Article III forum does require that the district court, the Article III court, decide those claims. So the breadth of my position is as broad as Your Honor's question suggests, but the implications are not quite as broad as Mr. Richland suggested when he said that an Article III forum always brings in inefficiency. I'm not sure. Kagan. One real difference between Marathon and this case is that Congress passed legislation in between, which brought the bankruptcy judges under the control of the district courts and made them entirely Article III entities. So you can look at a case like Marathon, I mean, not — supervised by Article III entities, not by the President, not by Congress. So one can look at a case like Marathon and say the problem there was that the President appointed the bankruptcy judges in a way that the President no longer does, and that the district courts did not have the supervisory control over the bankruptcy judges in the way that they do now, and that that makes a constitutional difference. I would respectfully suggest not, Justice Kagan, because there remains a difference between a non-Article III court and an Article III court, and the degree of supervision does not convert the non-Article III court into an Article III court. It simply means that we've gotten to this non-Article III forum in a way that gives slightly tighter control to the judiciary. But as a whole line of cases, including Crowley-Benson's, suggests, the degree of substantive review of individual decisions by non-Article III tribunals matters. It's not just the front end at which the judges or commissioners or whatever they are of the non-Article III tribunal are selected. It's also the back end at which the Article III forum is either really making the Article III decisions or giving deferential review to the decisions of a non-Article I court. So I do think the problem is not solved simply by a different method of appointment of bankruptcy courts. Now, if I may, I'd like to spend a few minutes on Section 157b-5. It was interesting to me that Mr. Stewart said the government had not. Ginsburg. Just clarify one point, Mr. Englert. As I understand it, before the code was amended, when the Federal courts were operating under the interim rule, it was standard that the bankruptcy judges, given a claim against the estate, routinely dealt with counterclaims. Isn't that what the practice was when the interim rule was in effect? Englert, I believe the answer is yes, Justice Ginsburg. I can concede that point. But there was, I believe, de novo review in district court, and in any event, the interim rules were in effect for a very short time as the arc of constitutional decisionmaking goes. Marathon was decided in 1982. Congress passed new legislation in 1984, and it took quite some time for the interim rules to be put into effect. Scalia. Did all of those court of appeals cases involve Article III claims? Did they pass upon the Article III contention? If not, it's our clear law that questions, jurisdictional questions that aren't raised and discussed are not decided for precedential purposes. How many of those cases grappled with the Article III question? I don't have a case count for you, Justice Scalia. Some did. I must concede that some did. But certainly not all did. But not most. Not most. And they were only decisions of lower courts, not of this Court. Now, on the personal injury tort provision in section 157b-5, which, by the way, was also repeated in 157b-2b and in 157b-2o to give emphasis to the fact that Congress really did not want bankruptcy judges trying personal injury tort claims, the greatest dispute before this Court is not whether we are right about 157b-5. Mr. Richland, in his reply brief, says we are not right, but I leave the Court to assess those arguments. And Mr. Stewart takes no position. The greatest dispute is whether that issue was preserved for review. And I want to suggest to this Court that it was clearly preserved for review. In the proof of claim filed on June 12, 1996, Mr. Marshall, Pierce Marshall, checked the box indicating that he was filing a personal injury tort claim. So from literally the first document that potentially brought this issue before the bankruptcy court, it was noted that it was a personal injury tort claim. Twenty-seven months passed before he moved to withdraw the reference. That's true. What's not true is that anything had happened on the defamation claim during those 27 months. And what's not true is that any court below held that delay against Pierce Marshall. If you look at pages 109 to 112 of the joint appendix filed in this Court, you will see that the timeliness of the motion to withdraw the reference was actually discussed in the motion itself. That's a matter easily accessible to this Court. Judge Keller granted the motion to withdraw the reference. He said, Pierce Marshall, you're right. Then he reversed himself. And you can find his ruling reversing himself at pages 138 to 139 of the joint appendix filed in this Court. But he did not reverse himself on timeliness grounds. Our respectful submission is that by granting the motion and then reversing on other grounds, he clearly accepted its timeliness. In any event, the issue was clearly raised in the Bankruptcy Court and in the district court. Kennedy, I just couldn't hear. On what grounds did he reverse himself, do you think? He concluded that the Bankruptcy Court actually did have authority to hear the claim and the counterclaim on the merits. Breyer, if we were to decide this case, then suppose we decide every other question and suppose you lost, then wouldn't we send it back for you, if you're right on that, for the Ninth Circuit to decide about that as an independent basis for no jurisdiction? Given the premise that I've lost every other issue, the Court could either. I had to make that premise in order to focus on the other issue. No, I understand, I understand. But given the premise, the Court could either then reach an alternative ground for affirmance, which is well within the ordinary operation of this Court's rules, or send it back. But let me suggest that there is a reason, and I believe a question from a member of the bench earlier suggested there might be a reason to reach the 157b-5 issue. And to put it colloquially and directly, the 157b-5 issue is easy. The constitutional question is easy. The constitutional question is hard. Kennedy, if it's that hard, why don't we just dig the case? I guess that will please you. Yes, I understand. No, but really, the 157b-5 question is, is the strongest argument Mr. Richland makes on the merits of the 157b-5 claim is that Congress meant only bodily injury when it referred to personal injury. But Section 522d-11 of the Code uses the term bodily injury. So we know that when Congress means bodily injury, it says bodily injury. It's also been suggested that the phrase personal injury or wrongful death is a phrase to which the canons of interpretation, nos quatera socis, eis generis, should somehow apply. That's not why Congress used personal injury or wrongful death. Until 1846, with Lord Campbell's Act, the common law of England was that a wrongful death claim didn't survive, couldn't be brought by the heirs because the victim of the tort was dead. It is quite common all around the country to use the phrase personal injury or wrongful death to make clear that the tort being covered is a tort that resulted in injury to someone who survived or is a tort that resulted in death. So there's nothing surprising about the use of that phrase. It doesn't mean bodily injury. And for those who look at legislative history, there is legislative history indicating quite emphatically that the members of Congress who were responsible for adding 157b-5, amending 157b-2b, amending 157b-0, and putting the abstention provisions in Section 1334c, really meant for bankruptcy judges to keep their hands off personal injury claims. The main claim in this case that conceivably could have given the bankruptcy court jurisdiction, if I lose with the other issues, was Pierce's defamation claim, not Vicki's intentional interference claim. We respectfully suggest they are both personal injury tort claims, but it's particularly clear that Pierce's defamation claim is an injury to his personal interest and reputation. So either by resolving the constitutional issue or through the canon of constitutional avoidance, or simply because it is the best reading of 157b-2, this Court should affirm the Ninth Circuit. Thank you. Roberts. Thank you, counsel. Mr. Richland, you have 3 minutes remaining. Thank you, Mr. Chief Justice. Let me address immediately this question of whether Judge Keller effectively denied this withdrawal motion on timeliness or not, because that truly is the easy way of resolving this personal injury question. The substantive question of whether these particular torts fall within the personal injury exception is a most difficult one, and it is one that this Court really shouldn't take on unless there is a substantial amount more of briefing and input from others. But the waiver issue is an easy one, and the reason it's an easy one is the record is undisputed that it was 27 months between the time that this claim, counterclaim was filed and between the time that this personal injury issue was raised in a withdrawal motion. During that period of time, there were numerous sanctions motions and numerous sanctions, discovery sanctions imposed upon Pierce Marshall. And in fact, what happened was, Judge Keller, before considering the initial withdrawal motion on the merits, before having a hearing on it, he initially granted the withdrawal. He then had a hearing, and at the hearing, what he said was, he may not have used the word timeliness, but what he said was, you've chosen this forum, the bankruptcy court is immersed in this case, and he used the colorful phrase, what you are experiencing here is the spawn of what you have begot. And I think that that clearly imports the notion that you are too late, you have not brought this in a timely fashion. Everything that has happened in the bankruptcy court has made it too late for you to come to this courtroom. Scalia, I would take that to mean you brought it in here and, you know, it's the same kind of argument that you were making. And that you chose to come into the court, and this is the spawn of your coming in. And the bankruptcy court is so immersed in this because of what has gone on during the bankruptcy proceedings that it is not appropriate for me to withdraw it. That seems to connote clearly the notion that it is not timely. Scalia, I would rather say 27 months is too long. That's timely. Well, 27 months is a long time in bankruptcy. Let me clear up this issue of whether the counterclaim was to the proof of claim or to the dischargeability. On the appendix to the petition, page 379, it is quite clearly stated that it was in response to 170 157b2c, that is a counterclaim to a person who has filed a claim. With respect to this issue of State law having some great significance here as opposed to Federal law, that issue has been rejected by this Court. In the Shore case, the majority opinion states very clearly that, in fact, there is no significance to the fact that something is a State law claim as opposed to a Federal claim. Well, but his basic argument, I think, is that in Marathon, fair is to make it totally fair. Nobody is being treated unfairly. Structurally, it does injure the prestige or something or the structure or the integrity of the Federal government, judiciary, Federal judiciary, to allow the bankruptcy judge to adjudicate a direct claim. Why is a counterclaim different? Well, I understand that argument, but the majority opinion in Shore states that the State law character of a claim, quote, has no talismanic power in Article III inquiries, that's 478 at 853. Thank you, counsel. Counsel, the case is submitted.